1

**CARLSON LYNCH LLP**
Todd D. Carpenter (CA 234464)
tcarpenter@carlsonlynch.com
Scott G. Braden (CA 305051)
sbraden@carlsonlynch.com
1350 Columbia Street, Ste. 603
San Diego, California 92101
Telephone:  619.762.1910
Facsimile:   619.756.6991

*Attorneys for Plaintiff and
Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MATILDA DAHLIN, on behalf of herself and all others similarly situated,

Plaintiff,

vs.

UNDER ARMOUR, INC., a Maryland corporation, and DOES 1-50, inclusive,

Defendants.

Case No. 2:20-cv-03706

**CLASS ACTION COMPLAINT**

1. **Violation of California's Unfair Competition Laws ("UCL"); CAL. BUS. & PROF. CODE §§ 17200,** *et seq.*

2. **Violation of California's False Advertising Laws ("FAL"); CAL. BUS. & PROF. CODE §§ 17500,** *et seq.*

3. **Violations of California's Consumer Legal Remedies Act ("CLRA"); CAL. CIV. CODE §§ 1750,** *et seq.*

**[DEMAND FOR JURY TRIAL]**

Plaintiff Matilda Dahlin ("Plaintiff") brings this action, on behalf of herself and all others similarly situated, against Defendant Under Armour, Inc. ("Under Armour" or "Defendant"), and states:

## I.      NATURE OF ACTION

1.      American consumers thrive on finding the best deal. Retailers, including Defendant, are keen to this fact and try to lure consumers to purchase their goods with advertised sales that promise huge savings off the regular price. But the promised savings are false if a retailer simply recasts its regular price as a discount off of some higher, made-up "original" price that no one ever pays. This class action seeks monetary damages, restitution, declaratory and injunctive relief from Under Armour arising from its deceptive business practice of advertising fictitious "original" prices and corresponding phantom discounts on Under Armour-branded outlet merchandise ("Outlet Merchandise") sold in Defendant Under Armour's outlet (or, as Defendant refers to them in publicly-available disclosures, "factory house") stores in California (the "Outlet(s)").

2.      The practice of false reference pricing occurs when a retailer fabricates a false "original" price, and then offers an item for sale at a deeply "discounted" price. The result is a sham price disparity that misleads consumers into believing they are receiving a good deal and induces them into making a purchase. In reality, the practice artificially inflates the true market price for these items by raising consumers' internal reference price, and therefore the value, ascribed to these products by consumers. The practice enables retailers, like Defendant, to sell their goods above their true market price. Consumers are damaged by the delta between the true market price of the goods and the inflated market price that is established by the false-discounting scheme.

3.      An overview of the illegal scheme and attendant harm are best demonstrated by the following example. Take a retailer who is in the business of selling suits: that retailer knows it can sell a particular suit, for a profit, at $250.00. That $250.00 price represents the "market" price for the suit and the price at which the retailer regularly offers the suit for sale.  The retailer then offers the suit on sale. However, instead of discounting the suit from

its true original price of $250.00, the retailer utilizes an inflated, "original" price for suit and lists it at $1,000.00, and then holds it out for sale at *70% off*—rendering the sale of price of the suit $300.00. Consumers who happen upon that purported fake "sale" are influenced by the amount of the perceived, substantial discount. Steep discounts entice consumers who would not normally be in the market to purchase merchandise, into making a purchase, because of the (perceived) extraordinary value of the discount. By presenting the consumer with a false "original" price of $1,000.00, the retailer has increased demand for the suit through the *perceived value* of the substantial discount of $700.00. This effect, in turn, impacts the true market price of the suit because more consumers are willing to pay $300.00 for a suit they believed was once sold for $1,000.00, when in fact, the true market price of the suit, without the false discount, was $250.00. If the retailer tried to sell that same suit for $300.00, *without* offering the false original price of $1,000.00 and the attendant 70% off discount, that retailer would not be able to sell any suits at $300.00 because the true market price of the suit is $250.00. Thus, through the use of a false original price and the corresponding phantom discount of 70% off, the retailer was able create a false "market" price for the suit—at $300.00. Plaintiff's case seeks that disparity—the impact on the increase in market price from $250.00 to $300.00 through Defendant's application of an illegal false discounting scheme.

4.      Retailers, including Under Armour, substantially benefit from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions. The information available to consumers varies for different types of products,[1] but consumers frequently lack full information about a

---

[1] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (*e.g.*, style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (*e.g.*, longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (*e.g.*, whether the shirt's cotton was produced using organic farming methods). Darby, Michael R., and Edi Karni. "Free Competition and the Optimal Amount of Fraud." *The Journal of Law and Economics* 16 no. 1 (1973): 67-88, pp. 68-69.

product and, as a result, can incorporate information from sellers to make purchase decisions.[2]

5.      Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Under Armour violated, and continues to violate, California and federal law which prohibits the advertisement of goods for sale as discounted from former prices that are false and which prohibits the dissemination of misleading statements about the existence and amount of price reductions. Specifically, Defendant violated and continues to violate: California's Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, CAL. BUS. & PROF. CODE §§ 17500, *et seq.* (the "FAL"); the California Consumer Legal Remedies Act, CAL. CIV. CODE §§ 1750, *et seq.* (the "CLRA"); and the Federal Trade Commission Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

6.      Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased one or more Outlet Merchandise products from the Outlets that was deceptively represented as discounted from a false advertised reference price. Plaintiff seeks to halt the dissemination of this false, misleading, and deceptive pricing scheme, to correct the false and misleading perception it has created in the minds of consumers, and to obtain redress for those who have purchased merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to enjoin Defendant from using false and misleading misrepresentations regarding former price comparisons in its labeling and advertising permanently. Further, Plaintiff seeks to obtain damages, restitution, and other appropriate relief in the amount by which Defendant was unjustly enriched as a result of its sales of merchandise offered a false discount.

---

[2] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Nelson, Phillip. "Information and Consumer Behavior." *Journal of Political Economy* 78, no. 2 (1970): 311-29, pp. 311-12.

7. Finally, Plaintiff seeks reasonable attorneys' fees pursuant to CAL. CIV. PROC. CODE § 1021.5, as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorneys' fees.

## II.      JURISDICTION AND VENUE

8. This Court has original jurisdiction of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and at least some members of the proposed Class (defined below) have a different citizenship from Defendant.

9. The Central District of California has personal jurisdiction over Defendant because Defendant is a corporation or other business entity which does conduct business in the State of California. Defendant conducts sufficient business with sufficient minimum contacts in California, and/or otherwise intentionally avail itself to the California market through the operation of the Outlets within the State of California.

10. Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District. A substantial part of the events giving rise to Plaintiff's claims arose here.

## III.      GENERAL ALLEGATIONS

### A.      Retailers Benefit from False Reference Pricing Schemes.

11. Under Armour engages in a false and misleading reference price scheme in the marketing and selling of its Outlet Merchandise in its Outlets.

12. Retailers substantially benefit from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions. The information available to consumers varies for different types of

products,[3] but consumers frequently lack full information about a product and, as a result, can incorporate information from sellers to make purchase decisions.[4]

13.    Defendant's deceptive advertised reference prices are thus incorporated into the consumer's decision process. First, a product's "price is also used as an indicator of product quality."[5] In other words, consumers view Defendant's deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[6] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[7] Under this concept, coined as "transaction utility" by Noble Prize-winning economist Richard Thaler, consumers place some value on the psychological experience of obtaining a product at a perceived bargain.[8]

---

[3] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (*e.g.*, style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (*e.g.*, longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (*e.g.*, whether the shirt's cotton was produced using organic farming methods). Darby, Michael R., and Edi Karni. "Free Competition and the Optimal Amount of Fraud." *The Journal of Law and Economics* 16 no. 1 (1973): 67-88, pp. 68-69.

[4] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Nelson, Phillip. "Information and Consumer Behavior." *Journal of Political Economy* 78, no. 2 (1970): 311-29, pp. 311-12.

[5] Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 54. Also see Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[6] Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 52.

[7] Darke, Peter and Darren Dahl. "Fairness and Discounts: The Subjective Value of a Bargain." *Journal of Consumer Psychology* 13, no 3 (2003): 328-338, p. 328.

[8] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of

14.     Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[9] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[10] Researchers report that consumer's internal reference prices adjust toward external reference prices when valuing a product.[11] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[12] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[13] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[14] and publications have summarized the empirical data as follows:

the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'". Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 205.

[9] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 68.

[10] Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 62.

[11] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, p. 48.

[12] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Thaler, Richard. "Mental Accounting and Consumer Choice." Marketing Science 4, no. 3 (1985): 199-214, p. 212.

[13] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

[14] Kalyanaram, Gurumurthy, and Russell S. Winer. "Empirical Generalizations from Reference Price Research." *Marketing Science* 14, no. 3 (1995): G161-G169, p. G161.

CLASS ACTION COMPLAINT

Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][15]

15.    Retailers, including Defendant, understand that consumers are susceptible to a good bargain, and therefore, Defendant has a substantial financial interest in making the consumer believe they are receiving a good bargain, even if they are not. A product's reference price matters to consumers because it serves as a baseline upon which consumers perceive a product's value.

**B.    California State and Federal Pricing Regulations Prohibit False "Original price" references and Out-Dated "Original price" references.**

16.    Under California law, a retailer may only discount an item from its own *original price* for up to 90 days; or, in the alternative, it may offer a discount from the original price of an item being offered by a competitor, within the relevant market, for up to 90 days. In either scenario, a retailer can only offer a "sale" from an original price for 90 days. At that point, on day 91, the retailer has two options: the product must either return to its full original price, or the retailer may continue to sell the product at the discounted price*, **_as long as it is discloses to the consumer the date on which the product was last offered for sale at its full retail price_**. See* CAL. BUS. & PROF. CODE § 17501. Under California law, a retailer cannot use an old, out-dated "original price" as the basis for a sale or discount, unless it discloses to the consumer the date on which the prior original price was offered in the market.

17.    Additionally, under the FTCA, when a retailer offers a discount from **_its own_**, former **_original price_**, the original price is required to have been a price at which **_the retailer_** held that item out for sale **_on a regular basis,_** for a **_commercially reasonable period of time_**. *See* 16 C.F.R. § 233.1(a) and (b) (emphasis added).

---

[15] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

### C. Defendant's Fraudulent Price Discounting Scheme Violates California State and Federal Regulations.

18.    Defendant advertises merchandise for sale by listing on the merchandise's price tag a fictitious or misleading "*original price*" and a corresponding "% off" to arrive at its "sale price." The original price communicates "the product's worth and the prestige that ownership of the product conveys." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir. 2013) (*citing* Dhruv Grewal & Larry D. Compeau, Comparative Price Advertising: Informative or Deceptive?, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."). "Misinformation about a product's 'normal' price is…significant to many consumers in the same way as a false product label would be." *Hinojos*, 718 F.3d at 1106.

19.    The reason why the *original price* is either false or misleading is because Under Armour either: 1) has never offered the Outlet Merchandise for sale at the *original price* (in the case of its made for Outlet clothing), or 2) has offered the Outlet Merchandise for sale at their *original price*, at some time period in the distant past—in violation of the 90 day time period afforded it to discount merchandise under California law[16] and the Federal regulation requiring the discount to be presented from a recent, regularly offered, original price.

20.    Additionally, Under Armour is not offering a discount or a percentage off (% off) a competitor's price for goods offered for sale in the relevant market. In the case of its "made for outlet" clothing, there are no other retailers who sell those goods; they are exclusively sold by Under Armour Outlets. In the case of its out of season Outlet Merchandise, the Under Armour merchandise being offered at its Outlet stores is not offered at any other relevant market competitors in the 90-day time period preceding the sale.

---

[16] If Under Armour continued to offer a discount from an original price, beyond the 90-day time period afforded it under California law, it was required to disclose the date on which the original prices were last offered. Under Armour does not make any such disclosure.

21.    How the scheme works: Under Armour represents to consumers its Outlet Merchandise's original price on the product's price tag. Under Armour then publishes the proffered discount as a percentage off (*i.e.,* 40% off) of the original price. The represented discounts are advertised on placards placed at, on, or above the particular Outlet Merchandise being discounted. The placards vary in size, but, on average, are approximately 6" tall by 9" to 12" inches wide. They are printed on black card stock with white and red print offering the advertised "% off".  The placards Appear as follows:



22.    The Outlets do not offer any merchandise at the full, or original price—ever. Every product in the store is discounted from an original price, the minute it hits the floor.

23.    Defendant's perpetual discounting of the Under Armour Outlet Merchandise constitutes false, fraudulent, and deceptive advertising because the original reference price listed is substantially higher than those prices actually offered by Defendant in its Outlets.

The reference prices are a total fiction used exclusively as a benchmark from which the false discount and corresponding "sale" price is derived. Defendant's scheme has the effect of tricking consumers into believing they are getting a significant deal by purchasing Outlet Merchandise at a steep discount, when in reality, consumers are paying for merchandise at its usual retail price. Defendant's deceptive pricing scheme further artificially raises the prices actually paid by consumers by creating the false impression of a bargain.

24.     Defendant's Under Armour Outlet Merchandise is *never* offered for sale, nor actually sold, at its advertised original price. Similarly, the regular Under Armour merchandise that may have been previously offered for sale at other retailers or online, is never offered for sale at the Outlets, at its advertised original price, within 90 days of that price being offered in the market. Upon information and belief, the regular Under Armour merchandise is a small percentage of its Outlets' total inventory and is typically several years removed from being marketed at the original price, if ever.

25.     Nowhere in Defendant's Under Armour Outlet stores does Defendant disclose that the reference or original prices used are not: 1) former prices; or 2) are not recent, regularly offered former prices; 3) or prices at which identical products are sold elsewhere in the market. Nor does it disclose the date at which the original prices were offered in the market or by one of Under Armour's other retailers. The omission of these disclosures, coupled with Defendant's use of fictitious advertised reference prices, renders Defendant's Outlet pricing inherently misleading.

26.     Thus, the advertised reference prices are false and induce consumers into believing that the Outlet Merchandise was once sold at the reference price, in the near term and will be again if the consumer does not make a purchase at the "bargain" price. Defendant engages in this practice knowing full well that the advertised products are never actually offered or sold at the advertised reference prices or never actually offered or sold at the advertised reference prices within 90 days of them being discounted in the Under Armour store.

27.     Moreover, the advertised discounts were fictitious because the reference prices did not represent a *bona fide* price at which Defendant previously sold or offered to sell the products, on a regular basis, for a commercially reasonable period of time, as required by the Federal Trade Commission ("FTC"). In addition, the represented advertised reference prices were not the prevailing market retail price within the three months (90 days) immediately preceding the publication of the advertised former reference price, as required by California law.

28.     Thus, Defendant's scheme intends to and does provide misinformation to the customer. This misinformation communicates to consumers, including Plaintiff, that the products sold in Defendant's outlets have a greater value than the advertised discounted price.

### D.     Investigation

29.     Plaintiff's investigation of the Outlets revealed that its Outlet Merchandise is priced uniformly. That is, Outlet Merchandise sold at Defendant's Outlet stores bears a price tag with a false original price and a substantially discounted "_____% Off," sale price typically 30% to 50% off. Plaintiff's counsel's investigation confirmed that the merchandise purchased by Plaintiff was priced with a false reference price and a corresponding discounted price for at least the 90-day period immediately preceding Plaintiff's purchase in violation of California law.

30.     Plaintiff's counsel's investigators were tracking the pricing of merchandise offered for sale at Under Armour stores beginning in early 2019, through early 2020. The investigation revealed that items listed for sale in the Outlets were never offered for sale at their full "original" price. Plaintiff's counsel's investigators visited Under Armour stores in California nearly every day to verify the prices being offered on the Outlet Merchandise. The prices were uniform across all stores visited in California. All items in the Under Armour stores were priced at a discount in the 90 days prior to Plaintiff's purchase of her purple mesh tank top and grey crossfit pants. *See* Exhibit 1, Plaintiff's investigation Summary.

31.    Additionally, Plaintiff's counsel's investigators attempted to find the items sold at the Outlets at other distribution channels in the relevant market. For example, in San Diego and Los Angeles, Plaintiff's counsel's investigators verified that the Outlet Merchandise sold at the Outlets was not the same as other Under Armour merchandise being sold at Nordstrom, Dick's Sporting Goods, Wal-Mart, Macy's, Footlocker, Ross, or TJ Max. Plaintiff's counsel's investigators compared the items tracked in the Outlets to Under Armour merchandise offered for sale at the aforementioned retailers on a monthly basis during the course of the investigation.

32.    Therefore, the "original" prices on the Outlet Merchandise sold at the Outlets are either false original prices or severely outdated prices that have not been offered in the relevant market or at an Under Armour store for at least more than a year.

33.    The false reference price and corresponding discount price scheme was both uniform and identical on almost all of the Outlet Merchandise sold at the Outlets. The only thing that changed was the requisite % off on certain merchandise items.

34.    The fraudulent pricing scheme applies to Outlet Merchandise offered on sale at Defendant's Outlets, including the products purchased by Plaintiff as described herein below.

### IV.    PARTIES

**Plaintiff**

35.    Matilda Dahlin resides in Santa Barbara, California. As she returned to exercising after giving birth to her first child in 2019, on October 2, 2019, Plaintiff went shopping for some new "work-out" clothes at the Outlet located at 100 Citadel Drive, Suite 648, Commerce, California 90040 (the "Citadel Outlet"). Plaintiff examined several exercise related items at the Citadel Outlet before deciding on a purple mesh tank top, size small, emblemized with the Under Armour logo in silver print above the left breast region, and a pair of grey, stretch cross-fit pants, size medium. After reviewing the items' advertised sale prices, Plaintiff examined the Outlet Merchandise and picked out sizes that she knew would fit her. The purple tank top had an advertised original price of $36.97, and was being

offered on sale as "50% off". The grey cross-fit pants had an advertised original price of $24.99, and was being offered on sale for "40% off". During her time at the Citadel Outlet on October 2, 2019, Plaintiff noticed numerous signs within the store advertising "30%, 40% and 50% Off" discounts on various items throughout the store.

36.    After observing the original prices of the items and the accompanying sale prices—the grey crossfit pants were advertised as 40% off and the purple tank top was advertised as 50% off—Plaintiff believed she was receiving a significant discount on the items she had chosen. Because she liked the items, felt that the discounted price would likely not last, and believed she was getting a significant bargain on the merchandise, she proceeded to the register and purchased the products. The discounts were a material representation to Plaintiff, and she relied upon them in making her purchase decision. The original prices and corresponding "sale price" of the items led Ms. Dahlin to believe that she was purchasing authentic Under Armour merchandise that was recently available at Under Armour stores, or other retail stores who carry Under Armour products, at the advertised original prices and / or sold formerly for those prices at the Outlet. She paid a total of $36.82 for the Outlet Merchandise.

37.    However, these products were never offered for sale at the listed reference price on the price tag and/or were certainly not advertised at those original prices within the 90-day time period preceding Plaintiff's purchase, as required under California law.

38.    At the time of her purchase, Plaintiff was also unaware that many products sold in the Citadel Outlet were manufactured for sale—specifically and exclusively—at Outlets, and that the products are never sold anywhere else. Neither Plaintiff's receipt, in-store signage, nor information listed on the price tags suggested that the products were exclusive to the Outlet.

39.    Plaintiff was damaged in her purchase because Defendant's false reference price discounting scheme inflated the true market value of the items she purchased. Plaintiff is susceptible to this reoccurring harm because she cannot be certain that Defendant has corrected this deceptive pricing scheme and she desires to shop at the Outlets in the future.

Plaintiff does not have the resources on her own to determine whether Defendant is complying with California and Federal law with respect to pricing practices.

**Defendants**

40.    Plaintiff is informed and believes, and upon such information and belief alleges, Defendant is a Maryland corporation with its principal executive offices in Baltimore, Maryland. Plaintiff is informed and believes that Defendant owns and operates the Outlets in California, and advertises, markets, distributes, and/or sells clothing and clothing accessories in California and throughout the United States.

41.    Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sues such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiff and the Class members as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

42.    The reference prices listed and advertised on products sold at the Outlets are false reference prices, utilized only to perpetuate Defendant's false discount scheme.

43.    Defendant knows that its reference price advertising is false, deceptive, misleading, and unlawful under California and federal law.

44.    Defendant fraudulently concealed from, and intentionally failed to disclose to, Plaintiff and other members of the Class the truth about its advertised discount prices and former reference prices.

45.    At all relevant times, Defendant has been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

46.    Plaintiff reasonably relied upon Defendant's artificially inflated reference prices and false discounts when purchasing her purple mesh tank top and grey cross training pants from the Citadel Outlet in Commerce, California. Plaintiff would not have made such purchase but for Defendant's representations regarding the substantial discounts being

offered on the Outlet Merchandise. Plaintiff would like to continue shopping at Defendant's Outlets in the future but cannot be certain of the veracity of Defendant's advertised bargains.

47.     Plaintiff and the Class reasonably and justifiably acted and relied on the substantial price differences that Defendant advertised, and made purchases believing that they were receiving a substantial discount on an item of greater value than it actually was. Plaintiff, like other Class members, was lured in, relied on, and was damaged by the deceptive pricing scheme that Defendant carried out.

## IV.   CLASS ALLEGATIONS

48.     Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant for violations of California state laws:

> All persons, within the State of California, who, within the preceding four years (the "Class Period"), purchased from a California Under Armour outlet store, one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class is Defendant, as well as their officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with his motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

49.     ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein.  The precise number of Class members is unknown to Plaintiff.

50.     ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions

affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.      whether, during the Class Period, Defendant used falsely advertised reference prices on its Outlet Merchandise labels and falsely advertised price discounts on merchandise sold in its Outlets;

b.      whether, during the Class Period, the original price advertised by Defendant was the prevailing market prices for the products in question during the three months period preceding the dissemination and/or publication of the advertised former prices;

c.      whether Defendant's alleged conduct constitutes violations of the laws asserted;

d.      whether Defendant engaged in unfair, unlawful and/or fraudulent business practices under the laws asserted;

e.      whether Defendant engaged in false or misleading advertising;

f.      whether Plaintiff and Class members are entitled to damages and/or restitution and the proper measure of that loss; and

g.      whether an injunction is necessary to prevent Defendant from continuing to use false, misleading or illegal price comparison.

51.      ***Typicality***: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class members.

52.      ***Adequacy***: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interest to those of the Class.

53.      ***Superiority***: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and

appropriate procedure to afford relief to him and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

54.     All Class members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendant's consistent false sale prices, advertising scheme, disseminated in a years-long campaign to California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's false advertising scheme when purchasing merchandise sold at the Outlets.

55.     Plaintiff is informed that Defendant keeps extensive computerized records of its Outlet customers through, *inter alia*, customer loyalty programs and general marketing programs. Defendant has one or more databases through which a significant majority of Class members may be identified and ascertained, and it maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

/ / /

/ / /

# V.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of California's Unfair Competition Law ("UCL")
### CAL. BUS. PROF. CODE §§ 17200, *et seq.*

56.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

57.    The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. CAL. BUS. PROF. CODE § 17200.

58.    The UCL imposes strict liability. Plaintiff need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices— only that such practices occurred.

*"Unfair" Prong*

59.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

60.    Defendant's actions constitute "unfair" business practices because, as alleged above, Defendant engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendant's acts and practices offended an established public policy of transparency in pricing, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

61.    The harm to Plaintiff and Class members outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

***"Fraudulent" Prong***

62.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

63.   Defendant's acts and practices alleged above constitute fraudulent business acts or practices as it has deceived Plaintiff and is highly likely to deceive members of the consuming public. Plaintiff relied on Defendant's fraudulent and deceptive representations regarding its false or outdated "***original prices***" for products sold at the Outlets. These misrepresentations played a substantial role in Plaintiff's decision to purchase those products at purportedly steep discounts, and Plaintiff would not have purchased those products without Defendant's misrepresentations.

***"Unlawful" Prong***

64.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

65.   Defendant's act and practices alleged above constitute unlawful business acts or practices as it has violated state and federal law in connection with its deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTC, false former pricing schemes, similar to the ones implemented by Defendant, are described as deceptive practices that would violate the FTCA:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former priced is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious – ***for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one***; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

> (b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly

19

and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of her business, honestly and in good faith – and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

66. In addition to federal law, California law also expressly prohibits false former pricing schemes. The FAL, CAL. BUS. & PROF. CODE § 17501, entitled "*Worth or value; statements as to former price*," states:

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

***No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement*** or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

CAL. BUS. & PROF. CODE § 17501 (emphasis added).

67. As detailed in Plaintiff's Third Cause of Action below, the CLRA, CAL. CIV. CODE § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

68. The violation of any law constitutes an "unlawful" business practice under the UCL.

69. As detailed herein, the acts and practices alleged were intended to or did result in violations of the FTCA, the FAL, and the CLRA.

70. Defendant's practices, as set forth above, have misled Plaintiff, the proposed Class, and the public in the past and will continue to mislead in the future. Consequently, Defendant's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

71.     Defendant's violation of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Class members and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and lead to financial damage for consumers like Plaintiff and the Class.

72.     Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and order Defendant to cease this unfair competition, as well as disgorgement and restitution to Plaintiff and the Class of all Defendant's revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

## SECOND CAUSE OF ACTION

**Violation of California's False Advertising Law ("FAL")**
**CAL. BUS. & PROF. CODE §§ 17500, *et seq.***

73.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

74.     CAL. BUS. & PROF. CODE § 17500 provides:

It is unlawful for any…corporation…with intent…to dispose of…personal property…to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated…from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement…which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading…

75.     The "intent" required by section 17500 is the intent to dispose of property, and not the intent to mislead the public in the disposition of such property.

76.     Similarly, this section provides: "no price shall be advertised as a former price of any advertised thing, unless the alleged former prices was the prevailing market price…within three months next immediately preceding the publication of the

advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement." CAL BUS. & PROF. CODE § 17501.

77. Defendant's routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendant's actual sale price), was an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that the Outlet Merchandise were regularly sold on the market for a substantially higher price than they actually were, therefore, leading to the false impression that the products sold at Outlets were worth more than they actually were.

78. Defendant misled consumers by making untrue and misleading statements and failing to disclose what is required as stated in the Code alleged above.

79. As a direct and proximate result of Defendant's misleading and false advertisements, Plaintiff and Class members have suffered injury in fact and have lost money. As such, Plaintiff requests that this Court order Defendant to restore this money to Plaintiff and all Class members, and to enjoin Defendant from continuing these unfair practices in violation of the UCL in the future. Otherwise, Plaintiff, Class members, and the broader general public, will be irreparably harmed and/or denied an effective and complete remedy.

## THIRD CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**CAL. CIV. CODE §§ 1750, *et seq*.**

80. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

81. This cause of action is brought pursuant to the CLRA, CAL. CIV. CODE § 1750, *et seq*. Plaintiff and each member of the proposed Class are "consumers" as defined by CAL. CIV. CODE § 1761(d). Defendant's sale of Outlet Merchandise in its Outlets to Plaintiff and the Class were "transactions" within the meaning of CAL. CIV. CODE § 1761(e). The

products purchased by Plaintiff and the Class are "goods" within the meaning of CAL. CIV. CODE § 1761(a).

82.     Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by CAL. CIV. CODE § 1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of merchandise sold in its e-commerce retail store:

a.     Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; (a)(13).

83.     Pursuant to § 1782(a) of the CLRA, on or about April 22, 2020, Plaintiff's counsel notified Defendant in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act.

84.     If Defendant fails to respond to Plaintiff's letter, fails to agree to rectify the problems associated with the actions detailed above, or fails to give notice to all affected consumers within 30 days of the date of written notice, as prescribed by § 1782, Plaintiff will move to amend her Complaint to pursue claims for actual, punitive, and statutory damages, as appropriate against Defendant. As to this cause of action, at this time, Plaintiff seeks only injunctive relief.

## VI.   PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the Class, requests that this Court award relief against Defendant as follows:

a.     an order certifying the Class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

b.     awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

c.     awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth

herein, and directing Defendant to identify, with Court supervision, victims of its misconduct and pay them all money they are required to pay;

   d. ordering Defendant to engage in a corrective advertising campaign;

   e. awarding attorneys' fees and costs; and

   f. for such other and further relief as the Court may deem necessary or appropriate.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all of the claims so triable.

Dated: April 22, 2020     **CARLSON LYNCH LLP**

       By:  _/s/ Todd D. Carpenter_
        Todd D. Carpenter (CA 234464)
        tcarpenter@carlsonlynch.com
        Scott G. Braden (CA 305051)
        sbraden@carlsonlynch.com
        1350 Columbia Street, Ste. 603
        San Diego, California 92101
        Telephone:  619.762.1910
        Facsimile:   619.756.6991

        *Attorneys for Plaintiff and*
        *Proposed Class Counsel*